**FIRST DIVISION**
**BARNES, P. J.,**
**MCMILLIAN and RICKMAN, JJ.**

**NOTICE: Motions for reconsideration must be** *physically received* **in our clerk's office within ten days of the date of decision to be deemed timely filed.**
**http://www.gaappeals.us/rules**

**February 28, 2018**

# In the Court of Appeals of Georgia

A17A2121. COMMUNITY & SOUTHERN BANK v. FIRST BANK OF DALTON et al.

A17A2122. STEARNS BANK, N. A. v. FIRST BANK OF DALTON et al.

McMILLIAN, Judge.

These consolidated appeals require us to once again consider how the proceeds from the sale of certain real property following foreclosure should be distributed among three banks with participation interests in the underlying loans. In Case No. A17A2121, appellant Community & Southern Bank ("CSB") contends that upon remand from this Court, the trial court erred by re-entering the same judgment in favor of First Bank of Dalton ("Dalton"), Community Bank of Pickens ("Pickens Bank") and Stearns Bank, N. A. ("Stearns") despite our direction in the previous appeal to vacate and reconsider certain issues. *Community & Southern Bank v. First Bank of Dalton*, 338 Ga. App. 341 (790 SE2d 80) (2016) ("*CSB I*"). In Case No.

A17A2122, appellant Stearns contends that the trial court erred by finding that a jury must determine how the proceeds from the sale should be distributed among the participating banks.

The facts are largely undisputed. In 2004, Gilmer Bank made two loans, one for $3,700,000 ("Loan 74744") and the other for $1,800,000 ("Loan 74747") to real estate developer A. S. Dover Development, Inc. ("Dover").[1] Both loans were secured by a security deed that encumbered the same parcel of undeveloped land, which Dover planned to develop into residential lots as part of a subdivision. Each loan agreement referenced the security deed, and the security deed referenced the two loans.

Shortly thereafter, under the terms of separate Participation Certificates and Agreements (collectively "Participation Agreements"), Gilmer sold a 27.07 percent participation interest in Loan 74744 to Dalton; a 27.07 percent participation interest in that loan to Pickens Bank, and a 45.946 percent participation interest in that loan to Jasper Banking Company ("Jasper"). In 2006, Gilmer Bank entered into a Participation Agreement with Jasper for a 100 percent participation interest in the

---

[1] Many, if not most, of the salient facts are more fully set out in our opinion from the prior appeal in this case.

other loan, Loan 74747.[2] Each Participation Agreement referenced the security deed. The Participation Agreements were subsequently renewed under substantially identical terms, with the last renewal occurring in 2008. When Gilmer ultimately failed in 2010, the FDIC transferred Gilmer's assets and responsibilities, including the loans and administration of the Participation Agreements, to CSB.[3] Jasper Bank also failed and its assets, including the Participation Agreements, were ultimately transferred to Stearns. Id.

In 2013, Dover defaulted on both loans, and CSB purchased the property in foreclosure for over $1.61 million. In December 2014, CSB sold the property to a third party for $1,452,470.12. A few days after the sale, Dalton and Pickens Bank filed a petition seeking a temporary restraining order, interlocutory injunction, and declaratory judgment against CSB and Stearns, contesting CSB's right to deduct its fees and expenses prior to distributing the funds to the Participating Banks, and further alleging that based upon "information and belief," CSB intended to distribute the proceeds from the sale "contrary to contract and the parties' course of

---

[2] Dalton, Pickens Bank, and Jasper or its successor Stearns, will be referred to collectively as "Participating Banks."

[3] CSB apparently has now been succeeded by Bank of the Ozarks.

3

performance." Dalton and Pickens Bank also gave notice of its intent to enforce the attorney fee provision of their Participation Agreements if CSB did not distribute the funds from the sale within ten days. CSB and Stearns filed answers to the petition, and Stearns also filed a counterclaim against Dalton and Pickens Bank, contending the proceeds of the sale should be distributed on a pro rata basis between Loan 74744 and Loan 74747.[4]

Several months later, on March 2, 2015, CSB filed a motion to tender the funds from the sale into the trial court registry. In making the tender, CSB specifically represented to the trial court that:

> There is a dispute as to the proper distribution of the . . . sale proceeds between the parties. Simultaneously with the filing of the Motion [CSB] tenders the amount of $862,565.70 into the Registry of the Court for determination of its proper distribution. The funds are submitted in four checks as follows: (a) $266,611.59 representing [Stearns'] portion of sale proceeds from the collateral for loan 74744; (b) $156,830.01 representing [Pickens Bank's] portion of sale proceeds from . . . loan number 74744; (c) $156,830.01 representing [Dalton's] portion of sale proceeds from . . . loan number 74744; (d) $282,294 representing [Stearns'] . . . portion of sale proceeds from . . . loan number 74747.

---

[4] Stearns also asserted a cross-claim against CSB for breach of contract based on Stearns' attempt to remove CSB as administrator of the loans.

Dalton and Pickens Bank objected to the proposed distribution of funds in CSB's motion to tender, and the parties filed motions and cross motions for partial summary judgment on various issues, including the proper distribution of the proceeds among the Participating Banks and whether CSB could deduct its expenses from the total amount available for distribution.

On August 3, 2015, the trial court entered an order addressing eight separate grounds raised in the parties' motions, finding that: (1) CSB received a payment that it was obligated to distribute to the Participating Banks in the amount of $1.45 million on December 15, 2014, which CSB was required to distribute within ten business days; (2) the Participating Banks were entitled to prejudgment interest pursuant to OCGA § 7-4-15 calculated on the $1.45 million sale price at the rate of seven percent beginning on December 15, 2014; (3) CSB was not entitled to deduct expenses prior to distributing the sale proceeds to the Participating Banks; (4) CSB was not entitled to deduct administrative fees; (5) CSB was liable for late fees; (6) Dalton and Pickens Banks were entitled to attorney fees as prevailing parties as defined in the Participation Agreements; (7) deferring the question of whether CSB's liability should be capped at the sale price to a later date; and (8) based on the proposed amounts as tendered in the trial court, CSB was liable in the minimum amounts to

5

each Participating Banks as follows: Dalton $156,830.01, Pickens Bank $156,830.01, and Stearns Bank $548,905.68 ("August 2015 order"). Adding prejudgment interest, late charges, attorney fees and court costs, the trial court then entered judgment for Dalton in the amount of $179,838.41; Pickens Bank in the amount of $179,838.41; and Stearns in the amount of $571,426.06. The trial court noted that these were the minimum amounts the Participating Banks were entitled to receive and that it had not yet ruled upon the exact amount owed to each participant.

CSB filed a notice of appeal, which was docketed in this Court as Case No. A16A0313. On appeal, CSB asserted two enumerations of error: (1) the trial court erred by failing to account for and deduct CSB's applicable expenses in collecting the loans from the damages awarded to the Appellees and (2) by granting partial summary judgment and by awarding attorney fees. In *CSB I*, we vacated the trial court's order, finding that, under the controlling default provision of the Participation Agreements, CSB was entitled to deduct its expenses from the proceeds of the sale before distribution to the Participating Banks and remanded "with instructions for the trial court to consider the amount of expenses CSB may deduct before it distributes any remaining amounts to the Purchaser." And because Dalton and Pickens Bank were no longer prevailing parties with respect to that issue, we also vacated the award

6

of attorney fees on that ground. *CSB I,* 338 Ga. App. at 346-47 (1) & (2). In so doing, we noted that Dalton and Pickens Bank were prevailing parties on other issues raised in their motion for partial summary judgment and that CSB had not appealed those findings. *CSB I,* 338 Ga. App. at 347 (2) & n.8.

Following remittitur, Dalton and Pickens Bank filed a motion for entry of judgment requesting that the trial court distribute the $862,565.70 CSB had deposited in the trial court's escrow account, arguing that CSB had previously admitted that amount was subject to disbursement and our opinion merely concerned the distribution of any "remaining" amounts over and above the amount CSB tendered in the trial court, that is, the amounts CSB had *not* deposited in the court's registry. The trial court agreed and also found that Dalton and Pickens Banks remained "prevailing parties" in this matter and left intact the attorney fees included in the previous award. The trial court then re-entered judgment to Dalton and Pickens Bank in the same amount of $179,838.41, nunc pro tunc to August 3, 2015; that order, which was entered on April 25, 2017, is the subject of the appeal in Case No. A17A2121. The trial court also entered a separate order denying Stearns' motion for summary judgment on the issue of how the proceeds of the sale should be apportioned among the Participating Banks, leaving that issue for resolution by a

7

jury; that order, which was also entered on April 25, 2017, is the subject of the appeal in Case No. A17A2122.[5]

*Case No. A17A2121.*

1. CSB argues that the trial court erred by entering judgment for Dalton and Pickens Bank in the exact same amount as the order on partial summary judgment that we vacated in our earlier appeal. We agree.

In *CSB I*, we unequivocally directed the trial court to vacate the summary judgment order and "remanded with instructions for the trial court to consider the amount of expenses CSB may deduct before distributing *any* amounts of the proceeds to the Purchaser." *CSB I,* 338 Ga. App. at 346 (1) (emphasis added). In concluding the opinion, we summarized our holdings as follows:

> In summary, we vacate the trial court's order and remand with instructions for the trial court to consider the amount of expenses CSB may deduct before it distributes any remaining amounts to the Purchaser. We also vacate the trial court's award of attorney fees in connection

---

[5] The trial court directed that its order on the motion for enforcement of judgment be made final pursuant to OCGA § 9-11-54 (b). Thus, although issues remained pending below, that order was directly appealable. Stearns also filed an application for interlocutory review of the trial court's order denying summary judgment on the distribution of the proceeds among the Participating Banks, and we granted Stearns' application on that issue.

8

with the deduction of expenses because Dalton and Pickens Bank are no longer entitled to attorney fees on that issue.

Id. at 347 (2). The judgment line also provided: "Judgment vacated and case remanded with direction."

On remand, Dalton and Pickens Bank argued, and the trial court accepted, that the reference to "remaining amounts" in the summary paragraph referred to the amounts that CSB had not tendered in the court's registry and thus *CSB I* only dealt with amounts not included in the judgment that had been entered, leaving the previous judgment "unappealed and . . . undisturbed." But that is a fundamental misreading of our previous opinion, which explicitly vacated the trial court's order that had entered the judgment in the body of the opinion and in the judgment line. Moreover, to the extent that confusion stems from the use of the term "remaining amounts" in the summary paragraph of the opinion, in context that term refers to the amounts remaining after the deduction of expenses, not the amounts remaining with CSB after tender to the trial court. Accordingly, the trial court erred by concluding

9

that we left the prior award undisturbed when we instructed that the court first deduct CSB's expenses prior to making any distributions of the proceeds.[6]

In the alternative, Dalton and Pickens Bank also advance the argument that the trial court's minimum judgment of $179,838.41 in their favor should be affirmed because CSB's tender in the trial court of those specific amounts to each Participating Bank constituted an admission in judicio of the Participating Banks' entitlement to the specific amount tendered. We find no merit to this contention. CSB's motion to tender plainly states that "[t]here is a dispute as to the proper distribution of the . . . sale proceeds between the parties[,]" and that CSB was tendering the funds into the registry of the trial court "for determination of its proper distribution." Tendering the funds under these stated conditions and caveats did not constitute an admission in judicio. Accordingly, the trial court's order of August 25, 2017 on Dalton and Pickens Bank's motion for entry of judgment is vacated and the case remanded for further proceedings consistent with this opinion and *CSB I*.

2. The trial court likewise erred in failing to reconsider the award of attorney fees on remand. In *CSB I*, we concluded that because Dalton and Pickens Bank were

---

[6] CSB also contends that the trial court improperly calculated interest on the total amount of the sale proceeds, and on the face of the trial court's order that assertion appears to be true. Thus, the interest award must be recalculated.

no longer prevailing parties with respect to the issue that CSB was permitted to deduct expenses before distributing any proceeds, the prior award of fees was vacated. Thus, we once again vacate the trial court's award of attorney fees in connection with the deduction of expenses because Dalton and Pickens Bank are no longer prevailing parties with respect to this issue and remand for further proceedings consistent with this opinion and *CSB I*.[7]

*Case No. A17A2122.*

3. We now turn to the issue of the distribution of the proceeds among the Participating Banks. The trial court denied the Participating Banks' motions for partial summary judgment on this issue, finding that a jury should decide how the proceeds of the sale should be distributed between Dalton, Pickens Bank, and Stearns.[8] Stearns argues that based on the Participation Agreements and the rule announced in *Georgia Realty Co. v. Bank of Covington*, 19 Ga. App. 219 (1 SE 267)

[7] As in *CSB I*, we note that Dalton and Pickens Bank were prevailing parties on other issues raised and decided on their motion for partial summary judgment. Because CSB did not challenge these rulings in the previous appeal, we express no opinion on the fees awarded with respect to these claims.

[8] As set out above, at the time of the sale of the collateral real estate, Stearns owned a 45.946 percent interest in Loan 74744, and Dalton and Pickens Bank each owned a 27.027 percent interest. Stearns also owned a 100 percent interest in Loan 74747.

11

(1917), the sale proceeds should be distributed pro rata based on the ownership interests set out in the Participation Agreements for both loans. Thus, according to Stearns, its pro rata share is its percentage of ownership interest in the total amounts secured by the Security Deed, or 86.252 percent of the total debt, and Dalton and Pickens are entitled to divide the remaining amounts, which would substantially reduce their respective participation interests. Further, Stearns argues that the Default Provision of the Participation Agreements also provides for pro rata distribution of the proceeds.

In *Georgia Realty*, which was decided over 100 years ago, we considered the priority of payment when separate loans are secured by a single security deed and the proceeds from the sale of the collateral are insufficient to satisfy the entire debt, concluding that

> [i]n the absence of any agreement or special equities to the contrary, the assignees and holders of the several separate notes of debt secured by a mortgage are entitled to share pro rata and without any preferences in the proceeds of the mortgage, when insufficient to satisfy them all; and it makes no difference that some of the debts matured earlier than the others or that the assignments were made at different times.

Id. at 223 (4).

Dalton and Pickens Bank acknowledge that the Court in *Georgia Realty* set out a general rule to be applied when multiple loans are secured by the same security, but point out that the general rule only applies "[i]n the absence of any agreement or special equities to the contrary." Further, contrary to Stearns' assertions, they argue the Participation Agreements only pertain to the particular loan for which the shares have been sold, and thus do not answer the question of how to distribute the proceeds when there are multiple loans and different Participation Agreements for each loan.

We turn first to the Participation Agreements. Under the Default Provision, which we held in *CSB I* controls here, payments are applied ratably first to expenses, and then "to the unpaid principal amount of the Loan in proportion to the respective unpaid investments of Seller and Purchaser in the Loan at the time of the Default . . ." Although we agree that answers the question of how the proceeds of the sale should be distributed with respect to each Participating Banks' interest in the "Loan" listed and referenced in that particular Participation Agreement, it does not answer the question of how the proceeds should be divided when there are separate loans.

Likewise, we find no "special equities" to support deviating from the general rule. Dalton and Pickens Bank claim that they were misled to believe that they, along with Stearns, were purchasing 100 percent of the security interests in the collateral

13

real estate, but the Participation Agreements stated on their face that the loans were secured by the property listed in the security deed, and the security deed referenced the two loans and each loan agreement referenced the security deeds. Further, the 2008 renewal of Loan 74744 states that it is "crossed with Loan # 74747" and the 2008 renewal of Loan 74747 states that it is "crossed with Loan # 74744." Accordingly, even accepting Dalton and Pickens Bank's contention that they were unaware that a hundred percent participation interest had been sold in Loan 74747, they were aware that the loan itself was secured by the same piece of property that secured Loan 74744. And under the general rule in *Georgia Realty*, if no participation interest had been sold in Loan 74747, CSB, as the successor to the lender, would have had the right to a pro rata share of the proceeds from the sale of the collateral real estate. Accordingly, the fact that Dalton and Pickens Bank may have been unaware that Stearns subsequently obtained a hundred percent participation interest in Loan 74747 does not present a special equity such that the general pro rata distribution rule should not apply. See *Georgia Realty*, 19 Ga. App. at 224 (4) ("it makes no difference... that the assignments were made at different times").

Nor do we agree with Dalton and Pickens Bank that the parties' conduct prior to default constitutes a special equity supporting a deviation from the general rule.

14

Although the two loans may have been treated differently with respect to payments made on the loans,[9] once the loans went into default, the Default Provision controlled. Accordingly, and based on the foregoing, the trial court erred by denying Stearns' motion for partial summary judgment seeking a pro rata distribution of the proceeds of the sale among the Participating Banks.

*Judgment vacated and case remanded with direction in Case No. A17A2121. Judgment reversed in Case No. A17A2122. Barnes, P. J., and Rickman, J., concur.*

---

[9] Under the terms of the Agreements, when lots were sold in the subdivision, the proceeds of the sales were transferred to Gilmer/CSB, who then distributed the proceeds pro rata according to the interests in the loans to the Participating Banks in Loan 74744. However, it does not appear that payments made in connection with Loan in 74747 were tied to the sale of the lots.